AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the
Southern District of Ohio

FILED
RICHARD W. NAGEL
CLERK OF COURT

4/28/20

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WEST. DIV. DAYTON

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>1119 W Third Street Apartment 2C, Dayton, Ohio,<br>including any outbuildings, garages, sheds or curtilage at<br>this location | )<br>)<br>)<br>)<br>)<br>)    Case No.<br><br>3:20-mj-208<br>Michael J. Newman |

## APPLICATION FOR A SEARCH WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

Attachment C

located in the _____ Southern _____ District of _____ Ohio _____ , there is now concealed *(identify the person or describe the property to be seized)*:

Attachment D

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC s. 841/846 | possession with intent to distribute controlled substances/conspiracy |
| 21 USC s. 843(b) | use of a telephone communication facility |
| 18 USC 1956(a) | money laundering |

The application is based on these facts:

See Attached Affidavit of Steve Lucas

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Steven M Lucas*
_____
*Applicant's signature*

Steve Lucas, SA of the DEA
_____
*Printed name and title*

**Via electronic means.**

Sworn to before me and signed in my presence via facetime.

Date: **4:04 PM, Apr 28, 2020**

*Michael Newman*
_____
Michael J. Newman
United States Magistrate Judge

City and state: Dayton, Ohio

Michael Newman, US Magistrate Judge
*Printed name and title*

| Print | Save As... | Attach | Reset |
|---|---|---|---|

**<u>AFFIDAVIT IN SUPPORT OF APPLICATION</u>**

I, Steven Lucas, hereby duly sworn, declare and state:

**I.**

**<u>INTRODUCTION</u>**

1.    I am a Special Agent ("SA") of the Drug Enforcement
Administration ("DEA").  I therefore am an officer of the United
States who is empowered by law to conduct investigations of, and
to make arrests for, offenses enumerated in 21 U.S.C. § 878.

2.    I have been a DEA SA since June 2005 and currently am
assigned to the Dayton Resident Office.  Prior to becoming a SA,
I was a police officer with the Schererville Police Department
between 1995 and 2005.  During that time, I was assigned to the
DEA HIDTA group in Merrillville, Indiana for approximately 4
years.  I have conducted and participated in complex drug
trafficking conspiracy and money laundering investigations which
have resulted in arrests; execution of search warrants that
resulted in the seizure of narcotics, narcotics proceeds and
other evidence of narcotics trafficking activities; and
supervised the activities of cooperating sources (CS) that have
provided information and assistance resulting in narcotics
purchases. Through training and experience, I am familiar with
the manner in which persons involved in the illicit distribution

1

of controlled substances often operate.  These people usually attempt to conceal their identities, as well as the locations at which they reside, and where they store controlled substances and the illegal proceeds derived therefrom.  Through training and experience, I am familiar with the practices of narcotics distributors, whereby they attempt to conceal the true nature, source and location of proceeds of illegal activity, commonly referred to as money laundering.  I have participated in several Title-III wiretap investigations and am familiar with how local drug traffickers and high level traffickers conduct transactions.

## II.

## <u>PURPOSE OF AFFIDAVIT</u>

3.    I make this affidavit in support of search warrants associated with a drug trafficking organization operating in the greater Dayton, Ohio area.  The application seeks the issuance of search warrants for the following addresses:

a.    532 Cherry Drive, Dayton, Ohio (Target Residence 1).  This property is more fully described in Attachment A, which is attached hereto and incorporated herein by reference.

b.    245 E Maplewood Avenue, Dayton, Ohio (Target Residence 2).  This property is more fully described in

2

Attachment B, which is attached hereto and incorporated herein by reference.

       c.   1119 W Third Street Apartment 2C, Dayton, Ohio (Target Residence 3). This property is more fully described in Attachment C, which is attached hereto and incorporated herein by reference.

(collectively, the Subject Properties).

    4. As detailed more fully below, based on the investigation in this case, I assert that there is probable cause to believe that evidence, contraband, and the fruits associated with the following federal felony offenses (collectively, "Target Offenses") is being stored at or can be found in the Subject Properties, including surrounding curtilage, outbuilding, or garages associated with those properties:

       a.   Possession with intent to distribute a controlled substance and distribution of a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1);

       b.   Unlawful use of a communications facility, in violation of Title 21, United States Code, Section 843(b);

       c.   Conspiracy to commit offenses under Title 21, in violation of Title 21, United States Code, Section 846;

3

d.    Laundering of monetary instruments, in violation of Title 18, United States Code, Sections 1956(a);

5.    Based on my training and experience, as described above, I believe that there is probable cause to believe that the items listed in Attachment D will be found at the premises described above.

### III.

### SOURCES OF INFORMATION

6.    I am familiar with the facts and circumstances described herein and make this affidavit based upon personal knowledge derived from my participation in this investigation, conclusions I have reached based on my training and experience, and upon information I believe to be reliable from the following sources: oral and written reports about this investigation and other investigations that I have received from federal agents as well as state and local law enforcement agencies; physical surveillance conducted by federal and local law enforcement agents, the details of which have been reported to me either directly or indirectly; telephone records, including toll records and subscriber information; information developed from cooperating sources; information developed from the use of pen registers and/or trap and trace; public records; evidence

4

obtained from search and seizure operations; electronic global position satellite ("GPS") information for various cell phones and vehicles; consensually recorded phone calls; and court-authorized interception of wire and electronic communications over certain telephones.

7. Unless otherwise noted, when I assert that a statement was made, I received the information from a law enforcement officer who provided the information to me, either verbally or in a written report. The officer providing me with the information may have received the information by way of personal knowledge or from another source. Except where otherwise noted, the information set forth in this affidavit has been provided directly or indirectly by agents of the DEA or other law enforcement agencies. Whenever in this affidavit I assert that a statement was made, the information was provided by another law enforcement officer (who may have had either direct or hearsay knowledge of the statement) to whom I have spoken or whose report I have read and reviewed. Moreover, the use of quotations to describe conversations herein either identify the actual words of the speaker or the interpretation of those words.

8. This affidavit does not include every fact known to me

5

through the investigation, but rather those facts required to establish the probable cause for the issuance of search warrants requested above.

## IV.

### PROBABLE CAUSE

9.    Since at least 2019, the DEA Dayton investigated several individuals who appear to work together to traffic kilogram quantities of various controlled substances such as fentanyl, heroin, and methamphetamine in the Dayton, Ohio area. A source of drug supply in Mexico provided controlled substances to the groups' members, who included a Dayton resident named Savon Pope.  Through the investigation, DEA identified drug trafficking associates of Pope, including Calvin Tribble II (hereinafter "TRIBBLE").  As detailed more fully below, DEA has developed information that revealed TRIBBLE as a multi-kilogram trafficker of fentanyl and other controlled substances in the Dayton, Ohio area.

10.    During late summer 2019, the Honorable Walter H. Rice, United States District Court Judge, entered an order authorizing the interception of wire and electronic communications to and from Pope's cellular telephone.  During the court-authorized wiretap of Pope's device, DEA lawfully

6

intercepted a call between Pope and a person later identified as TRIBBLE, who was using cell phone 937-581-4769.  During this conversation, Pope and TRIBBLE engaged in the following exchange:

> [BACKGROUND: NOISE THROUGHOUT CALL]

TRIBBLE:        Yup, yup.

POPE:           What up, big dog?

TRIBBLE:        What's up?

POPE:           [U/I]

TRIBBLE:        Hell no, man. They got me on, on spinners [PH] and shit.

POPE:           Damn. What? You still got the other shit?

TRIBBLE:        Mm-hum.

POPE:           You said, "Yeah"?

TRIBBLE:        Yup.

POPE:           What they sayin' about that?

TRIBBLE:        Are you talkin' about that uh— [STAMMERS] that, that other stuff that, you seen?

POPE:           Yeah.

TRIBBLE:        Oh, that shit gone now.

POPE:           Oh, that shit gone?

TRIBBLE:        Yeah, that shit gone.

POPE:           You ain't go nothin' else?

| | |
|---|---|
| TRIBBLE: | Bitch. |
| POPE: | That's all? |
| TRIBBLE: | Yup. |
| POPE: | All right, all right. What's the numbers on that? |
| TRIBBLE: | Thirty-two [PH] [32]. |
| POPE: | All right, all right. |
| | [PAUSE] |
| TRIBBLE: | All right, let me know. |
| POPE: | All right [MUMBLES] [U/I]. |
| | [END OF CONVERSATION] |

Based on my training and experience and source interviews, I believe that, during this call, Pope inquired what kind of drugs TRIBBLE had for sale and TRIBBLE indicated that "shit gone now", i.e., he had sold the fentanyl Pope previously had seen. TRIBBLE indicated that he did have "bitch" for sale, a common slang term for cocaine. Further, TRIBBLE's reference to "32" likely reflects the prevailing wholesale price for a kilogram of cocaine at that time – namely, $32,000.

11. On September 17, 2019, DEA obtained a warrant to use a cell site simulator to locate TRIBBLE's telephone -- 937-581-4769 -- that he used during his call with Pope. During September 2019, through the simulator, agents placed the phone

at **Target Residence 1**.  During surveillance at that time, DEA observed TRIBBLE leaving **Target Residence 1** and traveling with the phone.  I also know that **Target Residence 1** was associated with TRIBBLE from law enforcement database checks. Additionally, utilities for this address are listed in the name of Lakutia Dews, the purported mother of TRIBBLE.

12.  I am aware that, on November 13, 2019, a call for police service occurred at **Target Residence 1**.  During the call, TRIBBLE was present at **Target Residence 1,** and he identified the residence as belonging to his mother, Dews.  During 2020, up to and including April 2020, I have observed on multiple occasions TRIBBLE as well as vehicles registered to him at **Target Residence 1**.

13.  During January 2020, I was present for multiple meetings with a cooperating defendant ("CD") who gave information to law enforcement on multiple subjects.  Law enforcement has been able to corroborate information that CD provided, and DEA deems him credible.  Specifically, the CD provided information concerning TRIBBLE.  The CD listened to the above-described call between Pope and TRIBBLE.  The CD identified Pope and TRIBBLE as the participants on the call as CD recognized both men's voices.  The CD stated that TRIBBLE has

9

a Hispanic source of supply for drugs and that TRIBBLE was selling kilogram quantities of fentanyl, methamphetamine, and cocaine.

14.  I am aware that Dayton Police Department detectives have multiple sources of information who have identified TRIBBLE as a drug trafficker.  During 2020, I was present for an interview with confidential source ("CS"), who has assisted DEA over the last two years with information about local traffickers in Dayton, Ohio.  The CS has provided information which has led to multiple arrests of subjects and the seizures of kilograms of fentanyl and methamphetamine; DEA deems the CS reliable and trustworthy.  The CS stated that they have known TRIBBLE and TRIBBLE's family for several years and knew that TRIBBLE sold fentanyl and cocaine in Dayton, Ohio as recently as April 2020. According to the CS, the CS does not speak to TRIBBLE on a regular basis but learned from other subjects that TRIBBLE is selling kilogram quantities of drugs in Dayton, Ohio.

15.  On April 18, 2020, I was contacted by another DEA office that was conducting an investigation into laundering of drug proceeds by drug traffickers based outside of the United States.  I learned that a drug trafficker in Dayton, Ohio had secured a contract for the pickup and delivery of suspected drug

proceeds to this drug organization. Based on the other investigation, the Dayton RO was able to utilize a DEA SA, acting in an undercover capacity ("UC"), to contact the Dayton based drug trafficker (later identified as TRIBBLE) and arrange the pickup of the suspected drug proceeds.

16. On April 20, 2020, the UC contacted TRIBBLE and arranged to meet with TRIBBLE. During the recorded conversations between TRIBBLE and the UC, TRIBBLE stated that he would be in a blue truck when he met the UC. The UC and TRIBBLE met later day as described below. During that meeting, DEA observed TRIBBLE driving a blue Chevrolet Silverado registered to him at **Target Residence 2**. Notably, prior to meeting with TRIBBLE, the UC had conversations with an unknown Hispanic male who is likely TRIBBLE's source of drug supply. During their conversation, the Hispanic male advised that he would not be meeting the UC, but rather a subject in Dayton, Ohio would deliver the currency. I know that it is a common practice in Dayton, Ohio, for a Hispanic source of drug supply to coordinate both drug deliveries and monetary payments with the local traffickers. The UC's communications with the unknown Hispanic male further substantiates the CD's information and reinforces the recorded conversation between Pope and TRIBBLE wherein

11

TRIBBLE appears to be talking about TRIBBLE's source of supply making him wait.

17.  During the April 20, 2020 meeting between the UC and TRIBBLE (which took place in Huber Heights, Ohio), TRIBBLE delivered approximately $200,000 in US currency to the UC. Comprised of $20 dollar bills, the money was in a trash bag.  At the conclusion of the meeting, DEA conducted surveillance of TRIBBLE and watched as he went to a nearby restaurant, where he picked up a women, later identified as Seniqua CATLIN ("CATLIN").  It should be noted that CATLIN was present during the execution of a DEA drug warrant at a residence in Nashville, Tennessee during 2015.

18.  I am aware from multiple law enforcement databases that TRIBBLE commonly has used **Target Residence 2** as a location where he resides.  On April 20, 2020, after the money pickup operation, a traffic stop was conducted on TRIBBLE and CATLIN. TRIBBLE's driver's license indicated his residence as **Target Residence 2.  Target Residence 2** has current utilities that are maintained by CATLIN.

19.  On April 21, 2020, a warrant was utilized for both GPS tracking of cellular telephone 937-732-2879 and cell site simulation.  The GPS pings provided by AT&T on the morning of

12

April 22, 2020 showed that the phone appeared to be at **Target Residence 1** until approximately 1:00 AM and then moved to **Target Residence 3.** On April 22, 2020, the cell site simulation placed the phone in the area of **Target Residence 3**. Further, SA Lucas observed TRIBBLE appear to exit the common door at **Target Residence 3** and subsequently enter into a blue Chevrolet Silverado that investigators know is commonly driven by TRIBBLE. A check of the utilities for **Target Residence 3** showed that CATLIN also maintains utilities at the residence. Affiant is aware that it is common for drug traffickers to have girlfriends place apartments, utilities, and other property in their name to avoid law enforcement. Further, Affiant is aware that it is common for drug traffickers to store proceeds and other items at their parents' house.

20. On April 23, 2020, a court authorized GPS tracking device was installed on the blue 2016 Chevrolet Silverado registered to TRIBBLE with **Target Residence 2** as the listed address. On the same day, SA Lucas observed the vehicle and TRIBBLE at **Target Residence 1.**

21. On or about April 27, 2020, the GPS tracker on TRIBBLE's blue 2016 Chevrolet Silverado placed that vehicle at **Target Residence 1**, **Target Residence 2**, and **Target Residence 3**

13

at various times during that date.  Similarly, location data for the telephone that TRIBBLE used to speak with the UC placed that device in the vicinity of each of these locations at various times during the day.

22.  On or about April 28, 2020, the unknown Hispanic male who coordinated the April 20, 2020 money drop contacted the UC. The unknown Hispanic male indicated that he had more money for collection and requested that the UC meet this week to pick up the funds.  When the UC inquired who would be bringing the funds, the unknown Hispanic male indicated the same person who had delivered money last week, *i.e.*, TRIBBLE.  Based on this conversation, I believe that TRIBBLE is currently in possession of a sizable amount of drug proceeds and likely keeps these funds at the Subject Properties.

23.  Based on the statements from sources and source of information, I believe that TRIBBLE and others are working in concert to distribute methamphetamine, cocaine, and fentanyl. Further, based on intercepted communications and surveillance of TRIBBLE delivering $200,000 in suspected drug proceeds during April 2020, Affiant believes that **Target Residence 1, Target Residence 2**, and **Target Residence 3** are locations being used to store large amounts of US currency and drugs and may contain

14

other items related to drug trafficking. For instance, as noted above, location data has placed TRIBBLE's phone at or near each of these locations.

24. Based on my training and experience, I know that drug traffickers frequently use third parties or nominees to rent locations for them. They use these nominees to prevent law enforcement from detecting their association with, or control over, these locations. In doing so, drug traffickers frequently keep contraband – including drug proceeds, firearms, and other assets used to facilitate their drug trade at these locations.

25. Moreover, based on my training and experience, I know that drug traffickers frequently engage in the following common practices and activities:

a. It is common practice for drug traffickers to hide their assets, their addresses, their telephone numbers and cellular services by using other person's names in order to avoid detection by law enforcement officials.

b. It is common practice for drug traffickers to often maintain residences which are used as "stash houses" or locations for drug storage and distribution, and use "nominees" to obtain telephone service, utility service, and other services

to hide the true identity of the owner or person who will use that service.

c.    That drug traffickers often place assets in corporate entities in order to avoid detection of those assets by law enforcement officials.

d.    It is common practice, that even though these assets are in nominee names, drug traffickers will continue to utilize these assets by exercising dominion and control over them.

e.    It is common practice that drug traffickers possess large amounts of U.S. Currency in order to finance their ongoing illicit drug business and keep this contraband at their personal residences or at stash houses.

f.    It is common practice that, at their residences or stash houses, drug traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other documents relating to the transportation and distribution of drugs.  Drug traffickers commonly front (provide drugs on consignment) to their clients.  The books, records, receipts, notes, ledgers, and other documents are kept where the drug traffickers have ready access to them, such as their residences or at stash houses.

16

g. It is common for drug traffickers to provide false information to law enforcement officials regarding their identity and the address of their actual residence.

h. That persons involved in drug trafficking conceal from law enforcement in their residences, vehicles, and businesses the following items: drugs, large amounts of currency, financial instruments, jewelry, automobile titles, other items of value and/or proceeds of drug transactions, and evidence of financial transactions relating to the acquisition and concealment of large sums of money resulting from drug trafficking activities.

i. When drug traffickers amass large proceeds from the sale of drugs, they attempt to hide the true source of these profits, otherwise known as laundering the money. To accomplish this, drug traffickers many times utilize banks and/or financial institutions with their attendant services, including but not limited to, cashier's checks, money drafts, and letters of credit. Other entities used to launder drug proceeds include real estate firms and purported legitimate business fronts. Drug traffickers frequently keep such records at their residences or at stash houses.

17

j.    Drug traffickers commonly travel to facilitate their trafficking activities. After purchasing drugs, traffickers commonly transport, or cause to be transported, drugs to areas in which they will be distributed. Common methods of transportation include, but are not limited to, commercial airlines, and rental/private automobiles.  Drug traffickers frequently keep records relating to such travel at their residences or at stash houses.

k.    It is common practice that drug traffickers commonly maintain books and similar documents which reflect names, addresses, and/or telephone numbers of their associates in the drug trafficking organization.  This information can often be stored in cellular phones in places such as the contacts list.  Drug traffickers frequently keep such materials at their residences or at stash houses.

l.    Drug traffickers often take, or cause to be taken, photographs of themselves, their associates, their property and their product, and that the photographs are usually maintained at the residences, businesses, stash houses of drug traffickers.  Photographs such as these can commonly be found and stored in cellular phones and other electronic media, such as computers and tablets.

m.   Drug traffickers commonly have in their possession, (that is on their person, at their residence, stash houses, and/or their business) weapons, including firearms of various types.  Firearms are used to protect and secure a drug trafficker's property which may include, but is not limited to, narcotics, jewelry, narcotics paraphernalia, books, records, and U.S. Currency.

n.   Drug traffickers frequently maintain hidden compartments within their residence, stash houses and vehicles to hide drug trafficking evidence (money, ledgers, drugs, etc.), bury evidence in containers such as shoe boxes, or hide the evidence in safes.

o.   The exact quantities, prices, dates, and methods of delivery of drugs are seldom discussed in detailed terms over the telephone.  These details are usually agreed upon during face-to-face transactions.  For this reason, most telephone conversations regarding drugs are very brief and often in code, understood by the traffickers and designed to mislead or confuse non-participants of the conversations.  Drug traffickers make extensive use of cellular phones and text messaging beepers/pagers to facilitate contacting one another.  When calling a beeper or text messaging, traffickers commonly input

19

the number that should be called and sometimes add additional instructions in the form of additional digits. The structure of a drug distribution organization usually consists of sources of supply, wholesale distributors, retail distributors, and the ultimate consumers. The wholesale distributors often have more than one source of supply, and likewise the retail distributors often obtain drugs from more than one wholesale distributor. After receiving a quantity of drugs, the source of supply will often move the drugs to a location other than where he/she sells them to the wholesale distributors. The location of the source of supply's so-called "stash house" is generally a well-guarded secret known only to the source of supply and his closest associates. Most of the drugs, as well as diluting and packaging materials and weighing equipment, are usually kept at the "stash house." Only those amounts needed for immediate sale are usually kept at the point of sale.

p. Evidence of past communication between drug traffickers can be found in saved or deleted text messages, call logs, and other forms of electronic communication occurring over, stored in, or accessed by the cellular phone.

q. I have repeatedly encountered a practice wherein drug traffickers distribute a cellular telephone number to their

drug customers, often described by traffickers as a "money phone." The money phone is used primarily to communicate with those customers. The customers will subsequently call the trafficker on that cellular telephone number to arrange a purchase of drugs as needed. The trafficker will many times field calls from several customers at once, and then direct all those customers to travel in their car to a designated meeting point. Once all the customers have driven to the designated place, the drug trafficker will appear in his vehicle, quickly conduct hand to hand drug transactions with each customer, and then drive away. Drug traffickers often maintain money phones at their homes, stash houses, businesses or on their person.

Based on the foregoing, I respectfully submit that there is probable cause to issue search warrants for the above-described location

_Steven M Lucas_
_____
Steven Lucas
Special Agent
Drug Enforcement Administration


Sworn and subscribed before me on the _____ day of _____ 2020.


_Michael Newman_                               **4:05 PM, Apr 28, 2020**
_____ Michael J. Newman _____
              United States Magistrate Judge
Honorabl                          wman
United States Magistrate Judge           **Via electronic means.**

21

ATTACHMENT A

**532 Cherry Drive, Dayton, Ohio, including any outbuildings, garages, sheds or curtilage at this location.**  The residence is depicted below:



ATTACHMENT B

**245 E Maplewood Avenue, Dayton, Ohio**, **including any outbuildings and curtilage at this location**. The residence is depicted below:



245 E Maplewood Ave

ATTACHMENT C

**1119 W Third Street Apartment 2C, Dayton, Ohio, including any outbuildings and curtilage at this location.** The residence is located within an apartment building in Dayton, Ohio. The door to the apartment building in which Apartment 2C is located is pink/lavender in color with a glass pane. The numbers 1119 are above the entry. The apartment to be searched within the building is 2C.

ATTACHMENT D

I submit that there is probable cause to search for the following items:

A.    Log books, records, payment receipts, notes, and/or customer lists, ledgers, and other papers or electronic records relating to the transportation, ordering, purchasing, processing, and distribution of controlled substances.

B.    Papers, tickets, notices, credit card receipts, travel schedules, travel receipts, passports, and/or records, and other items relating to domestic and foreign travel to obtain and distribute narcotics and narcotics proceeds, including, but not limited to airline receipts, vehicle rental receipts, credit card receipts, travel schedules, diaries, hotel receipts, truck logs, travel agency vouchers, notes, records of long distance telephone calls, e-mail and other correspondence.

C.    Address and/or telephone books and papers reflecting names, e-mail and physical addresses and/or telephone numbers of individuals, partnerships, or corporations involved in drug trafficking and money laundering.

25

D.   Financial records, financial statements, receipts,
     statements of accounts and related bank records, money,
     drafts, letters of credit, money orders and cashier's
     checks receipts, passbooks, bank checks, escrow
     documents, and other items evidencing the obtaining,
     secreting, transfer, and/or concealment of assets and
     the obtaining, secreting, transferring, concealment,
     and/or expenditure of money.

E.   Electronic equipment such as pagers, computers,
     electronic organizers, facsimile machines, cellular
     telephones, caller ID, telephone answering machines,
     police scanners and two-way radios.

F.   United States currency, precious metals, coins bullion,
     jewelry, and financial instruments, including, but not
     limited to stocks and bonds.

G.   Proceeds of drug trafficking activity or any items used
     to facilitate drug trafficking activity, including
     automobiles.

H.   Photographs and/or photographic albums or video tapes
     and recordings of houses and other real estate,
     automobiles, and of other assets, persons, and/or
     controlled substances.

26

I.   Indicia of occupancy, residency, and/or ownership of the premises, and vehicles including, but not limited to utility and telephone bills, canceled envelopes, keys, deeds, tax bills, titles, vehicle registrations and documentation regarding storage units/lockers.

J.   Illegal drugs, including, but not limited to fentanyl, methamphetamine, heroin and other controlled substances, and other tools used in the drug trade, including, but not limited to, scales, vacuum sealers, packaging material, presses, razor blades and cutting agents.

K.   Firearms and ammunition.

L.   Any computers, cellular telephones, tablets or electronic devices that may contain the above-described documents or items in electronic format.

M.   Text messages, instant messages and the like that concern or relate to drug trafficking activity, including, but not limited to, sale prices, drug quantities, customers, sources of supply, or storage locations.

N.   Records, documents, or items reflecting indicia of occupancy or ownership at a residence.